Mark S. HINES, and wife; Lisa B. Hines, Plaintiffs–Appellees,

v.

UNITED STATES of America, Defendant–Appellant.

Mark S. HINES, and wife; Lisa B. Hines, Plaintiffs–Appellees,

v.

UNITED STATES of America, Defendant–Appellant.

Nos. 89–3347, 89–3379.

United States Court of Appeals, Fourth Circuit.

Argued June 6, 1990.

Decided Sept. 4, 1990.

David Michael Moore, argued (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, David I. Pincus, Margaret P. Currin, U.S. Atty., Raleigh, N.C., on brief), Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant-appellant.

J. Troy Smith, Jr., argued (Leigh A. Allred, on brief), Ward and Smith, P.A., New Bern, N.C., for plaintiffs-appellees.

Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and RUSSELL and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

Here the government appeals the judgment of the district court in favor of taxpayers Mark and Lisa Hines allowing them to claim substantial depreciation and investment interest deductions stemming from the purchase and lease of a quantity of computer equipment in 1981. The district court rejected the government's contention that the investment scheme constituted a "sham" transaction designed solely to obtain tax benefits. The court also found that the taxpayers were "at risk" within the meaning of Internal Revenue Code § 465 with regard to loans taken out to finance the investment. Because the record plainly will not support a finding that the taxpayers were motivated by anything other than a desire to obtain tax benefits, we reverse the judgment of the district court. We do not find it necessary to reach the question of whether the taxpayers were "at risk" for any loans taken out to purchase the equipment.

## I.

In 1981, Mark Hines, a North Carolina resident who was running his family's building supply business, was alerted by an old friend, Kenneth Morris, a life insurance agent, to an investment scheme organized by Systems Leasing, Inc., involving the purchase and lease of computer equipment. After consulting with his accountant, James G. Sullivan, Hines purchased various items of used IBM computer equipment, along with certain lease rights, from Systems Leasing for $593,807 on September 30, 1981. Hines made a $13,807 cash down

payment and issued a "full recourse" promissory note for $580,000. The note bore interest at 15.125% and was payable as follows: $116,967 in prepaid interest due at closing; no other payments for the first 16 months; and then monthly payments of $11,636.35 for months 17 through 95.

Systems Leasing had purchased the equipment from Citibank on September 30, 1981, and then leased it back to Citibank for a term of eight years beginning in 1981.[1] Systems Leasing financed the bulk of its purchase by issuing a promissory note to Citibank for $580,000, the same amount of the promissory note that Hines issued to Systems Leasing. When Hines purchased the equipment, he acquired Systems Leasing's rights under the lease to Citibank, which included monthly payments of $115 for months 1 through 17, $11,751.35 for months 18 through 30, and $11,636.35 for months 31 through 96 of the lease. Hines also acquired the right to collect "re-leasing" revenues beginning in September 1985 in an amount equal to 40 percent of any net rents collected from subleases of the equipment after that date. Citibank was also made the exclusive re-marketing agent for the equipment at the end of the eight year lease period.

The transaction involving Hines, Systems Leasing, and Citibank had three distinctive characteristics important to this appeal. First, the purchase was highly leveraged with "front loaded" interest payments. Together with the accelerated depreciation available for the computer equipment, this arrangement enabled taxpayers to claim large deductions relative to the size of the cash invested. Hines and his wife Lisa claimed over $740,000 in depreciation and interest expense with respect to the equip-

---

1. Before being purchased by Hines, the computer equipment had already undergone a series of sale/leaseback transactions. The actual user of the equipment, the Ministry of Internal Affairs in the government of the Netherlands, had leased the equipment in August 1981 for an undisclosed period of time from Centraal Beheer Financiering B.V. of the Netherlands (Centraal Beheer). Centraal Beheer then sold the equipment to Citicorp Leasing Nederland B.V.

(Citicorp Netherlands) and leased it back. Citicorp Netherlands sold the equipment to Citibank, N.A. (Citibank), and leased it back. Citibank then sold it to Systems Leasing. Each of the leaseback agreements, including the agreements between Citibank, Systems Leasing, and Hines, provided for fixed payments as well as a percentage of net rents that Centraal Beheer or its successors might obtain in subleasing the equipment after a specified date.

ment on their federal income tax returns between 1982 and 1985.[2]

The second distinctive characteristic of the investment scheme is that the payments on the purchase loans and the income from the equipment lease were structured to be essentially offsetting. The fixed monthly payment owed by each of the three parties to the arrangement during most of the term of the eight year lease was the same amount, approximately $11,700. As a result, after the initial payments at closing, the schedule created a circle of payments that was self-sustaining. Each payment by Hines to Systems Leasing on his purchase loan was covered by a virtually identical payment from Citibank on the lease. Each payment by Citibank to Hines on the lease was in turn covered by a payment from Systems Leasing to Citibank on a loan taken out by Systems Leasing when it purchased the equipment. Finally, each payment by Systems Leasing to Citibank on its purchase loan was covered by the payment from Hines on his purchase loan. While the parties do not appear to have accomplished the monthly transactions through offsetting ledger entries, in most months little or no money actually needed to change hands.

The third important characteristic of the investment scheme is that, without considering the tax benefits, Hines would by virtue of his cash down payment and prepaid interest on the purchase suffer a loss of $127,324 in payments to Systems Leasing in excess of the fixed payments he would receive from Citibank during the term of the lease to Citibank. The profit from the investment, if any, would come from the "re-leasing" income that Hines could begin to receive after September 1985 and from the residual value of the equipment at the end of the eight year lease to Citibank.

After being informed about the Systems Leasing scheme, Hines discussed the potential investment with Morris and his accountant Sullivan. Sullivan examined the effect of the investment on Hines' tax liability, but none of the three conducted any independent investigation into the potential income from re-leasing revenues or from the residual value of the equipment. Their sole source of information was a spread sheet prepared by Systems Leasing summarizing the projected revenues, expenses, and tax savings from the transaction, including an indication that the "write-off ratio" would be between 3 and 4 during the first two years, the "write-off ratio" being the ratio of the taxpayer's expected tax deductions to his actual cash investment. Sullivan testified that he took the figures from the spread sheet and determined that Hines had sufficient income to handle the deductions that the investment would generate for his tax returns. Without conducting any further investigation, Sullivan recommended that Hines invest in the Systems Leasing program. In his words, Hines "had high income and was paying a lot of tax," and the investment would help to alleviate that problem.

Hines and his wife claimed over $740,000 in depreciation and interest deductions with respect to the equipment on their federal income tax returns between 1982 and 1985. After an audit by the IRS, Hines filed amended returns on which he did not claim these deductions and then filed administrative claims for tax refunds. The IRS denied the claims, and Hines filed this action in the United States District Court for the Eastern District of North Carolina seeking a refund of the taxes paid because of the contested deductions.

At trial, the IRS contended that the purchase of the computer equipment was a "sham" transaction devoid of any legitimate business purpose and should be disregarded for federal income tax purposes. It also contended that Hines was not "at risk" within the meaning of § 465 of the Internal Revenue Code with respect to his promissory note to Systems Leasing. Applying the standard set forth in *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91–92 (4th Cir.1985), the district court held that the transaction was not a sham. In addition, the court found that the taxpayer was at risk for the investment loans. The court entered judgment for the taxpay-

---

**2.** The Hines' 1979 return is also at issue, but only because of a carryback loss from 1982.

ers and awarded them attorney's fees and costs as prevailing parties under I.R.C. § 7430. The government appealed, and, for the reasons discussed below, we reverse the judgment of the district court.

## II.

Hines argues that he is entitled to the depreciation and investment interest deductions from his participation in the Systems Leasing program because he entered into the investment with the legitimate business motivation of making a profit, not merely to obtain tax benefits. We cannot agree. The evidence in the record supports only the conclusion that the taxpayer had no expectation of profit independent of the tax benefits.

▬ The IRS may ignore for tax purposes any sham transaction, *i.e.*, a transaction designed to create tax benefits rather than to serve a legitimate business purpose. *Frank Lyon Co. v. United States*, 435 U.S. 561, 573, 98 S.Ct. 1291, 1298, 55 L.Ed.2d 550 (1978) (looking "to the objective economic realities of a transaction rather than to the particular form the parties employed"). In upholding a Tax Court finding that a computer sale and leaseback arrangement similar to the one in this case was a sham, this court set forth a two-prong test for analyzing such transactions:

> To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists.

*Rice's Toyota*, 752 F.2d at 91. While it is important to examine both the subjective motivations of the taxpayer and the objective reasonableness of the investment, in both instances our inquiry is directed to the same question: whether the transaction contained economic substance aside from the tax consequences.

▬ We turn first to the objective prong to determine "whether a reasonable possibility of profit from the transaction existed apart from [the] tax benefits" of the investment. *Rice's Toyota*, 752 F.2d at 94. As discussed above, the fixed payments in the transaction left Hines with a loss of $127,324 over the eight years of the lease to Citibank. The only way for Hines to realize any profit on the investment was through the two sources of variable income: (i) anticipated re-leasing income, and (ii) the residual value of the equipment at the end of the eight year lease to Citibank. We shall address each source in turn.

Beginning in the 49th month of his lease with Citibank, Hines was entitled to receive, in addition to the fixed lease payments from Citibank, 40% of any net rents generated by subleasing the equipment. Hines testified at trial that he had in fact received over $87,000 in such "re-leasing" income. The government takes the position that Hines should have expected the equipment to become obsolete within six or seven years and that the money Hines actually received was therefore nothing other than a "fluke." The record does not contain any estimate of the level of re-leasing income that Hines should have expected at the time he purchased the equipment, but the taxpayers do not contend that Hines expected more than $87,000.

Turning to the second source of variable income, the residual value of the equipment at the end of the lease with Citibank, the district court found that the equipment should have been expected to be worth between $19,000 and $57,000. The government contends that the expected residual value was near the bottom of that range while Hines contends that it was near the top. The government contends further that Hines would actually receive less than the residual value because Citibank is entitled under the remarketing agreement to deduct expenses, such as those for an appraisal, and to receive ten percent of any proceeds as a remarketing fee.

We do not find it necessary to resolve these disputes. The evidence as construed in the light most favorable to taxpayers still fails to yield any reasonable expectation of a profit. Balancing the sum of the actual re-leasing revenues ($87,000), which were clearly at the high end of the reason-

ably expected range, and the equipment's highest expected residual value ($57,000) against a known loss of $127,324 yields a maximum expected profit of only $17,000 over an eight year period on an investment of almost $130,000. Moreover, the cash invested was paid in 1981 while any re-leasing income would not begin to accrue until the fifth year of the investment and the residual income could not be realized for eight years. Given that under the best circumstances the investment could yield only a minimal profit, and that in all likelihood the investment would produce far less than the initial cash outlay, a reasonable person would have expected to suffer a substantial loss, aside, of course, from tax benefits.

■ Under the test in *Rice's Toyota*, however, a transaction with an expected loss may not be a sham if the taxpayer was motivated by some legitimate business reason other than to obtain tax benefits. In this case, Hines claims that he subjectively believed, even if he was objectively wrong, that the investment would yield a profit aside from the tax benefits. The mere assertion of such a belief, particularly in the face of strong objective evidence that the taxpayer would incur a loss, cannot by itself establish that the transaction was not a sham. As we have noted, "[t]he ultimate determination of whether an activity is engaged in for profit is to be made … by reference to objective standards, taking into account all of the facts and circumstances of each case. A taxpayer's mere statement of intent is given less weight than objective facts." *Faulconer v. Commissioner*, 748 F.2d 890, 894 (4th Cir.1984). We have examined the record for some evidence that Hines in fact believed the investment would yield a profit, but we find nothing to support such an assertion.

As in *Rice's Toyota*, Hines could have realized a profit on the investment only if he "could re-lease the computer … or realize a substantial amount by its sale.… Residual value of the computer (either in selling or releasing) should therefore have been the crucial point of inquiry for a person with a business purpose of making a profit on this transaction." *Rice's Toyota*, 752 F.2d at 92. Neither Hines nor his advisors Morris and Sullivan claimed to have any expertise in the field of computer equipment leasing, nor did they make any independent inquiry into the market for used computer equipment. They made no effort to obtain an appraisal or even to consult an expert. Sullivan, an accountant, admitted that he did not investigate the value of the computer equipment and that his role was mainly to run the numbers through Hines' tax returns. While Sullivan recommended the investment as profitable, "the record does not reveal that the accountant's opinion reflects anything more than the fact that the transaction, if successful, would generate large tax deductions." *Id.*

Hines attempts to distinguish the decision in *Rice's Toyota* on several grounds. He points out that the transaction at issue there involved an inflated purchase price and non-recourse debt that facilitated abandonment of the investment after the front-loaded deductions had been exhausted and before the artificially low deductions in later years began to inflate tax liability. By contrast, Hines purchased the equipment for less than the estimated fair market value, according to evidence produced at trial by both sides, and signed a full recourse promissory note on which he has continued to make payments to Systems Leasing. Hines also argues that the promotional materials he received, although they clearly set forth the tax consequences of the transaction, emphasized the profitability of the investment more than did the materials received by the taxpayer in *Rice's Toyota*. Finally, the taxpayer in *Rice's Toyota* relied on representations directly from the computer leasing company concerning the residual value of the equipment despite a warning from his accountant and an offer from the company to provide an expert appraisal. Hines contends that, although he also failed to investigate the residual value of the equipment, he relied on the advice of trusted friends and received no recommendation that he should conduct an independent investigation.

The above distinctions are unpersuasive because they fail to address the central point in this appeal: that the transaction contain economic substance and promise a profit aside from tax benefits. The assumption of full recourse debt reduced the tax benefits Hines would obtain from the investment by preventing abandonment, but those benefits he did obtain were nonetheless substantial enough to offset his potential losses. Systems Leasing may not have touted the tax consequences of its program as loudly as did the promoter in *Rice's Toyota*, but the tax benefits were nonetheless clearly presented to Hines. Moreover, as discussed above, the record plainly shows that Hines had no objective basis for expecting a profit from the transaction and showed no subjective concern over the re-leasing revenues or residual value of the equipment, the only two sources of profit aside from the tax benefits.

The structure of the transaction reinforces the conclusion that Hines entered the transaction to obtain tax benefits. The interest payments were entirely front-loaded to maximize the deductions available at the beginning of the investment. This front-loading, combined with accelerated depreciation, enabled Hines to deduct three to four times his cash investment during the first two years. In addition, the lease and debt payments between the three parties (Hines, Citibank, and Systems Leasing) were structured to be offsetting. The circularity meant that the transaction became self-sustaining after the payments at closing with virtually no further financial input necessary from any of the parties.

We recognize that individuals may structure transactions to take advantage of tax benefits. In many instances, Congress has provided the benefit to encourage just such behavior. After a certain point, however, the transaction ceases to have any economic substance and becomes no more than a sale of tax profits. The evidence in the record clearly indicates that the investment

scheme organized by Systems Leasing reached the point where the tax tail began to wag the dog. Hines had no hope of realizing a profit on the investment, but the tax benefits generated were more than sufficient to cover his potential losses. Looking to the substance of the transaction, we can come to no other conclusion than that Hines "did not purchase or lease a computer, but rather, paid a fee ... in exchange for tax benefits," *Rice's Toyota*, 752 F.2d at 95 (citation omitted). We therefore reverse the district court's conclusion to the contrary.[3] Having directed the entry of judgment for the government, we vacate the award to taxpayers of attorneys' fees and other litigation costs.

REVERSED.

---

3. The government also argued that Hines could not deduct interest paid on the loans used to purchase the equipment because he was not "at risk" within the meaning of I.R.C. § 465. Because we find that the transaction at issue in this case was a sham, we need not reach this question.