T.C. Memo. 2017-69

UNITED STATES TAX COURT

LARRY E. AUSTIN AND BELINDA AUSTIN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ESTATE OF ARTHUR E. KECHIJIAN, DECEASED,
SUSAN P. KECHIJIAN AND SCOTT E. HOEHN, CO-EXECUTORS,
AND SUSAN P. KECHIJIAN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 8966-10, 8967-10.          Filed April 24, 2017.

Lynn Forrest Chandler, Jonathan P. Heyl, and Timothy P. Lendino, for petitioners.

Nina E. Choi, Patricia P. Davis, and Mark L. Hulse, for respondent.

[*2]    MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  With respect to petitioners Larry E. Austin and Belinda Austin, the Internal Revenue Service (IRS or respondent) determined deficiencies and accuracy-related penalties as follows:

| Year | Deficiency | Penalty sec. 6662(a) |
|---|---|---|
| 2000 | $346,079 | $69,216 |
| 2001 | 338,436 | 67,088 |
| 2002 | 2,875,116 | 575,023 |
| 2003 | 12,962,223 | 2,592,445 |
| 2004 | 3,567,442 | 713,488 |

With respect to petitioners Estate of Arthur E. Kechijian and Susan P. Kechijian, the IRS determined deficiencies and accuracy-related penalties as follows:

| Year | Deficiency | Penalty sec. 6662(a) |
|---|---|---|
| 2000 | $347,369 | $69,473 |
| 2001 | 341,566 | 68,313 |
| 2002 | 2,867,433 | 573,487 |
| 2003 | 12,869,823 | 2,573,965 |
| 2004 | 3,731,802 | 746,360 |

This case involves a complex set of transactions that give rise to five principal issues.  For convenience, we will generally refer to Larry Austin and the late Arthur Kechijian as "petitioners."  The first question is whether stock petitioners received in December 1998, labeled "restricted stock," was subject to a substantial

**[*3]** risk of forfeiture when issued to them, as they contend, or rather was "substantially vested" within the meaning of section 83[1] and section 1.83-1(a)(1), Income Tax Regs., as respondent contends. We resolve this issue in petitioners' favor.

Second, respondent contends that certain transactions involving petitioners' closely held S corporation and a related employee stock ownership plan (ESOP) lacked economic substance. In the event we find that petitioners' stock was subject to a substantial risk of forfeiture upon receipt, respondent urges lack of economic substance as an alternative ground for finding that petitioners had various amounts of taxable income for 2000-2003. We resolve this issue in petitioners' favor and find no deficiencies for 2000-2003.

Third, if the first two issues are resolved against him, respondent contends that the fair market value (FMV) of petitioners' stock constituted taxable income to them when the restrictions lapsed on January 1, 2004, notwithstanding their purported "surrender" of the stock. Finding that the transaction by which the shares were "surrendered" and "repurchased" lacked economic substance, we

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[*4] resolve this issue in respondent's favor and conclude that each petitioner must report for 2004 taxable compensation income of approximately $45.7 million.

The fourth question concerns a $35 million "special dividend" that the S corporation paid in 2004. We conclude that each petitioner acquired, by virtue of the $45.7 million income inclusion mentioned above, a sufficient basis in his shares to absorb this dividend. The dividend therefore was not separately taxable to either of them.

Finally, we sustain respondent's determination that petitioners are liable for accuracy-related penalties for 2004.

FINDINGS OF FACT

The parties filed a stipulation of facts and accompanying exhibits that are incorporated by this reference. When the petitions were filed, Larry Austin and Arthur Kechijian resided in North Carolina. Belinda Austin and Susan Kechijian, who are parties to these cases solely by virtue of having filed joint Federal income tax returns with their husbands, likewise resided in North Carolina. Mr. Kechijian died in 2013; he resided in North Carolina at that time, and his will was probated in North Carolina. On October 23, 2013, we substituted his estate as a party petitioner.

[*5] A.     The UMLIC Entities and the ESOP

Petitioners worked together for more than 15 years in the "distressed debt loan portfolio business."  Before 1998 petitioners were the original shareholders and members of a group of related corporations and limited liability companies (LLCs) that we will call the "UMLIC entities."  Through the UMLIC entities petitioners acquired and serviced portfolios of distressed debt that they had purchased from financial institutions and government agencies.  Petitioners typically sought investors to lend them money to purchase these obligations.

Petitioners initially created a number of UMLIC entities to avoid cross-collateralization and facilitate discrete financing arrangements for each loan portfolio.  In December 1998 petitioners organized, and elected S corporation status for, a holding company called UMLIC Consolidated, Inc., a North Carolina corporation (UMLIC S-Corp. or company).  In a section 351 transaction each petitioner transferred to the company his respective ownership interests in the UMLIC entities, with a cost basis of $142,566, in exchange for 47,500 shares of the company's common stock.  There were three primary reasons for this consolidation:  to reduce the number of tax return filings and financial statement reports; to allow assets to be moved more efficiently among the subsidiary entities; and to

**[\*6]** take the first step down the road toward achieving substantial tax benefits, as explained in detail below.

As part of the section 351 exchange, each petitioner executed with UMLIC S-Corp. a "Restricted Stock Agreement" (RSA) and an "Employment Agreement." A principal purpose of these agreements was to require petitioners to perform future services for UMLIC S-Corp. in order to secure full rights in their stock. Read together, these agreements specified a five-year "earnout" period and provided that either petitioner would forfeit 50% of the value of his shares if he voluntarily terminated his employment with UMLIC S-Corp. before January 1, 2004. Removing or waiving this restriction required consent of the holders of 100% of the shares entitled to vote.

In Austin v. Commissioner, 141 T.C. 551 (2013), ruling on motions for summary judgment, we rejected respondent's contention that petitioners' UMLIC S-Corp. stock was "substantially vested" when issued to them by virtue of section 1.83-3(c)(2), Income Tax Regs. Under that regulation, a requirement that stock be forfeited "if the employee is discharged for cause or for committing a crime will not be considered to result in a substantial risk of forfeiture." However, we reserved for trial a number of other issues, including respondent's alternative argument that petitioners' stock was substantially vested because their status as the

**[*7]** company's sole directors "enabled them to remove at will any ownership restrictions to which their stock was subject, so that the forfeiture conditions were unlikely to be enforced." Austin, 141 T.C. at 568-569; see sec. 1.83-3(c)(3), Income Tax Regs.[2]

Petitioners were the sole directors of UMLIC S-Corp. throughout the tax years at issue. Mr. Kechijian was the company's president; his primary responsibilities included servicing loan portfolios, collection, general operations, and human resources. Mr. Austin was the senior executive vice president; his primary responsibilities included acquiring loan portfolios, performing due diligence in the evaluation of loan portfolios, formulating bidding strategies, performing cashflow analysis, and maintaining investor relationships. As of 1998 the company had 60-80 employees, many of whom had worked with petitioners for many years.

Effective January 1, 1998, certain tax-exempt entities, including ESOPs, became eligible to be shareholders in S corporations. Small Business Job Protection

---

[2]Because petitioners received their UMLIC-S Corp. shares in a section 351 exchange, they were relieved of any obligation to recognize gain upon receipt of the shares or upon transfer of the ownership interests in the UMLIC entities to UMLIC S-Corp. The chief relevance of determining whether the shares were "substantially vested" upon receipt is that this determination controls whether petitioners' shares are treated for 2000-2003 as "outstanding stock of the corporation," sec. 1.1361-1(b)(3), Income Tax Regs., for purposes of allocating UMLIC S-Corp.'s income to petitioners.

[*8] Act of 1996 (SBJPA), Pub. L. No. 104-188, sec. 1316(a), 110 Stat. at 1785 (codified as section 1361(c)(6)). In December 1998, with the avowed goal of encouraging long-term job retention, petitioners caused UMLIC S-Corp. to form an ESOP for its employees, including petitioners. This ESOP initially had three co-trustees: petitioners and David Faber, the company's assistant controller.

In a determination letter issued in early 1999 the IRS recognized this ESOP as tax exempt under sections 401(a) and 4975(e)(7). In 2008 the IRS examined the ESOP for its 2003 and 2004 plan years. After making technical adjustments to correct errors by the plan administrator, the IRS certified the ESOP as being in full compliance under the Code for tax years 1998-2004. The IRS and UMLIC S-Corp. executed a closing agreement to this effect.

In December 1998 the company funded the ESOP with a $500,000 loan, which was refinanced several months later with an outside bank. These funds were used to purchase (on the basis of an outside appraisal) 5,000 shares of the company's common stock. Thus, as of December 18, 1998, each petitioner owned 47.5% of the company's common stock and the ESOP owned the remaining 5%.

In August 1999 each petitioner established an irrevocable grantor trust for the benefit of his family. Each transferred to his trust 24,500 shares of UMLIC S-Corp. common stock, still subject to the RSA, in exchange for a $1.83 million

**[*9]** promissory note.  The deed of trust permitted petitioners to "reacquire any of the trust property by substituting other property having an equivalent value."  From August 1999 until March 2004 petitioners, their grantor trusts, and the ESOP were the only shareholders of UMLIC S-Corp.

B.      The Restructuring and the Payouts

In late 2003 petitioners reorganized the ownership structure of their business.  Two concerns prompted this restructuring.  First, petitioners thought it might be desirable to bring in outside investors, such as private equity and hedge funds, to provide additional capital for the acquisition of distressed loan assets.  Petitioners believed that such investors would be reluctant or unwilling to purchase shares in an S corporation partially owned by an ESOP.  Second, because of a Code amendment scheduled to take effect in January 2005, the S corporation/ESOP structure that petitioners had adopted was about to lose much of its allure as a tax planning device.  See Economic Growth and Tax Relief Reconciliation Act of 2001 (EGTRRA), Pub. L. No. 107-16, sec. 656(d)(1), 115 Stat. at 135 (codified as section 409(p)) ("The amendments made by this section shall apply to plan years beginning after December 31, 2004."); Rev. Rul. 2003-6, 2003-1 C.B. 286.

**[*10]** Petitioners' restructuring plan envisioned selling all of UMLIC-S Corp.'s assets, consisting principally of its operating subsidiaries, to a new holding company wholly owned (directly or indirectly) by petitioners. The new holding company, which would thereafter conduct the distressed loan business, would be organized as an LLC, thus facilitating possible investment by sophisticated private investors. UMLIC S-Corp. would be left with cash equivalents, essentially "freezing" its value--and the value of the 5% stake held by the ESOP--as of the date the sale was consummated. And the new holding company would acquire a stepped-up basis in the acquired assets for purposes of claiming future deductions for depreciation and amortization expense.

In October 2003 petitioners formed UMLIC Holdings LLC (Holdings), as the acquiring company. Petitioners each held (through intermediaries) a 50% membership interest in Holdings and were its sole directors. Because UMLIC S-Corp. proposed to sell substantially all of its assets to Holdings, the transaction had to be approved by the former's shareholders, including the ESOP. To avoid potential conflicts of interest, petitioners (on advice of counsel) resigned their roles as co-trustees of the ESOP. Scott Hoehn, UMLIC S-Corp.'s controller, was selected to serve as successor co-trustee with Mr. Faber. Mr. Hoehn and Mr. Faber, as senior employees of the company, were both beneficiaries of the ESOP.

[*11] Before voting on the asset sale the ESOP secured (on advice of counsel) a fairness opinion that approved the terms as fair to the ESOP participants. In November 2003 petitioners and the ESOP unanimously approved the sale of UMLIC S-Corp.'s operating assets to Holdings in exchange for a $190 million interest-bearing promissory note and the assumption of certain liabilities.[3] UMLIC S-Corp. realized gain of $174.6 million on this sale. It elected out of installment sale treatment under section 453 and allocated 100% of the gain to the ESOP, allegedly the sole holder of its then-outstanding shares, on a Schedule K-1, Shareholder's Share of Income, Deductions, Credits, etc.

The attorneys who prepared the fairness opinion noted that UMLIC S-Corp.'s post-sale assets--consisting of a promissory note and cash--would be undiversified. As a condition of approving the sale, the ESOP required that its 5% stake be redeemed within one year. The redemption price was set at 5% of UMLIC S-Corp.'s value on November 30, 2003 (i.e., $10,397,688) or 5% of its value on the redemption date, whichever sum was larger.

In December 2003 petitioners engaged in a series of transactions that caused UMLIC S-Corp. to be reincorporated in South Carolina and renamed UMLIC

---

[3]The ESOP used a passthrough voting system whereby participants voted confidentially through a third party who directed the ESOP trustees to vote in accordance with the majority vote of the participants.

**[*12]** Consolidated, Inc. (New UMLIC S-Corp.). Petitioners elected S corporation status for New UMLIC S-Corp. At that time all of the stock held by petitioners and their grantor trusts was converted to New UMLIC S-Corp. stock. Although petitioners did not articulate a clear business purpose for the reincorporation, Mr. Austin testified that it was intended to take advantage of lower corporate franchise taxes in South Carolina.

Petitioners faithfully discharged their obligations under the RSA and the employment agreements through December 31, 2003. On January 1, 2004, the restrictions on their stock (now denominated New UMLIC S-Corp. stock) accordingly lapsed. As of that date the FMV of the 47,500 shares of stock held by each petitioner and his grantor trust was $45,857,434.

Petitioners thereafter executed a series of transactions in order to avoid having to report this sum on their 2004 Federal income tax returns as compensation subject to income and employment tax. On March 30, 2004, each petitioner entered into a "surrender agreement" and a "subscription agreement" with New UMLIC S-Corp. These agreements provided that each petitioner would surrender his 47,500 existing (and now unrestricted) shares and simultaneously repurchase 47,500 identical shares in exchange for a $41.5 million promissory note with a 10-year term.

**[\*13]**  The previously approved redemption of the ESOP's shares occurred on June 22, 2004.  Because the appraised value of New UMLIC S-Corp. was then lower than it had been on November 30, 2003, the redemption price was set at $10,397,688, the previously agreed higher price.  The ESOP received cash in that amount in exchange for its 5,000 shares.[4]  Approximately $9.1 million of the sale proceeds inured to the benefit of 101 ESOP participants other than petitioners.  The ESOP was subsequently terminated; its assets were merged into a section 401(k) plan serviced by United Mortgage, one of the UMLIC entities.

Following redemption of the ESOP's shares, New UMLIC S-Corp. declared and paid, on June 30, 2004, a distribution (uniformly referred to by the parties as the "special dividend") of $35 million.  Each petitioner received $8.47 million for his 23,000 shares.  Each petitioner's grantor trust received $9.03 million for its 24,500 shares.

C.    Petitioners' Tax Reporting and IRS Examination

Petitioners did not report any income from UMLIC S-Corp. on their 2000-2003 Federal income tax returns.  They took the position that their stock (and that owned by their grantor trusts) was subject to a "substantial risk of forfeiture" and

---

[4]The payout to the ESOP was funded by a payment from Holdings to New UMLIC S-Corp. on the $190 million promissory note.

[*14] was thus "substantially nonvested" within the meaning of section 1.83-3(b), Income Tax Regs. For purposes of subchapter S, "stock that is issued in connection with the performance of services * * * and that is substantially nonvested * * * is not treated as outstanding stock of the corporation, and the holder of that stock is not treated as a shareholder solely by reason of holding the stock." Sec. 1.1361-1(b)(3), Income Tax Regs.[5]

Because the 95,000 shares owned by petitioners and their grantor trusts were deemed to be "non-outstanding," UMLIC S-Corp. for tax years 2000-2003 allocated 100% of its income, losses, deductions, and other tax items to the ESOP. Consistently with the company's reporting, neither petitioner reported any flow-through items from UMLIC S-Corp. on the joint return he filed with his spouse for 2000, 2001, 2002, or 2003. And because the ESOP was a tax-exempt entity, it likewise reported no taxable income from UMLIC S-Corp. for 2000-2003.

For 2004 each petitioner took the position that he had "surrendered" his original shares and acquired replacement shares worth $46 million in exchange for a $41.5 million promissory note. Each petitioner accordingly reported the difference between those amounts, or $4.5 million, as compensation income under sec-

---

[5]A holder of restricted S corporation stock may elect to be treated as a shareholder. See sec. 1.1361-1(b)(3), Income Tax Regs. Predictably, neither petitioner made this election.

[*15] tion 83. Each petitioner took the position that he and his grantor trust had acquired an increase in basis in the New UMLIC S-Corp. shares by virtue of the respective $41.5 million promissory notes so that the $35 million "special dividend" merely reduced their respective bases and generated no additional taxable income to either.

The IRS examined petitioners' returns for 2000-2004. It determined that petitioners' stock in UMLIC S-Corp. was "substantially vested" upon receipt in 1998; that their stock and that of their grantor trusts was "outstanding" for 2000-2004; and that they were accordingly required to report their pro rata shares of the company's income for each year. The IRS further determined that petitioners did not have sufficient bases in their New UMLIC S-Corp. stock to make the 2004 special dividend nontaxable, and it determined accuracy-related penalties for all five years.

The IRS issued petitioners timely notices of deficiency for 2000-2004, and they timely sought redetermination in this Court. In July 2012 we granted respondent leave to amend his answer to assert lack of economic substance as an alterna-

[*16] tive basis for the adjustments determined in the notice of deficiency.[6]  We

subsequently consolidated the cases for purposes of trial, briefing, and opinion.

## OPINION

The IRS' determinations in a notice of deficiency are generally presumed

correct, and the taxpayer bears the burden of proving those determinations erro-

neous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Petitioners

contend that respondent bears the burden of proof for two reasons:  (1) they have

satisfied the requirements of section 7491(a) for shifting the burden of proof and

(2) respondent raised a "new matter" in his amended answer.  See Rule 142(a)(1).

Because we decide all factual issues on a preponderance of the evidence, we need

not decide who has the burden of proof.  See sec. 7491(a); Estate of Turner v.

Commissioner, 138 T.C. 306, 309 (2012), supplementing T.C. Memo. 2011-209.

I.     Petitioners' Stock as "Restricted Stock"

Section 83(a) applies where property is transferred to a taxpayer "in con-

nection with the performance of services."  Upon such a transfer, the excess of the

FMV of the property over the amount (if any) paid for the property is included in

---

[6]In his amended answer respondent alleged (among other things) that peti-
tioners "did not have a non-tax business purpose for the March 30, 2004, surren-
der" of their stock and that they entered into the subscription agreements in order
to avoid reporting "the fair market value of the stock as income * * * and pay em-
ployment taxes in the year 2004."

[*17] the taxpayer's gross income for the first taxable year in which the taxpayer's rights in the property are transferable or "are not subject to a substantial risk of forfeiture." Sec. 83(a). The statute thus permits a taxpayer to defer recognition of income until his rights in the restricted property become "substantially vested." Sec. 1.83-1(a)(1), Income Tax Regs.; see Strom v. United States, 641 F.3d 1051, 1056 (9th Cir. 2011).

Section 83(c) provides that "[t]he rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual." The regulations echo the statutory definition. See sec. 1.83-3(c), Income Tax Regs. The risk of forfeiture analysis requires a court to determine whether the property interests transferred by the employer are "capable of being lost." Gudmundsson v. United States, 634 F.3d 212, 219 (2d Cir. 2011).

Petitioners contend that their stock in UMLIC S-Corp. was subject to a substantial risk of forfeiture when they received it in December 1998 and remained subject to a substantial risk of forfeiture until January 1, 2004, when the five-year earnout restriction lapsed. Respondent contends that petitioners' stock was substantially vested when they received it in December 1998; that their stock was thus "outstanding" for subchapter S purposes throughout the tax years at issue; and that

[*18] petitioners consequently were required to report their pro rata shares of the company's income on their 2000-2003 returns.

Respondent advances two threshold arguments that we address briefly. First, he contends that section 83 is inapplicable because petitioners supplied only property, and no substantial future services, in exchange for the UMLIC S-Corp. stock. In our prior Opinion in these cases we stated that "[s]ection 83(a) applies where, as concededly occurred here, property is transferred to a taxpayer 'in connection with the performance of services.'" Austin, 141 T.C. at 559 (emphasis added). If petitioners had not received the stock in connection with the performance of services, the regulation upon which respondent relied at the summary judgment stage--section 1.83-3(c)(2), Income Tax Regs.--would have had no possible application. In any event, the RSAs and the employment agreements by their terms required petitioners to perform substantial future services for UMLIC S-Corp. as a condition of receiving the full value of their stock. We reject respondent's current argument to the contrary.

Second, respondent contends that petitioners could not have received stock that was "substantially nonvested" for section 83 purposes, yet concurrently have "owned" at least 80% of the total combined voting power of all classes of UMLIC S-Corp. stock, as was necessary to qualify for nonrecognition of income under

[*19] sections 351(a) and 368(c). Respondent urges that petitioners are improperly "trying to have it both ways."

We are unpersuaded by this argument. Respondent does not contend that the section 351 exchange was invalid and has not sought to impose tax on that transaction. The regulations do provide that, "[f]or purposes of subchapter S, stock that is issued in connection with the performance of services * * * and that is substantially nonvested * * * is not treated as outstanding stock of the corporation, and the holder of that stock is not treated as a shareholder solely by reason of holding the stock." Sec. 1.1361-1(b)(3), Income Tax Regs. But this regulation by its terms applies only "[f]or purposes of subchapter S"; respondent cites no authority for the proposition that it would disable a stock-for-stock exchange from qualifying for nonrecognition treatment under subchapter C. In any event, even if we were to find that petitioners' stock was "not outstanding" for section 351 purposes, section 83 would still prevent recognition of any income attributable to the stock until the restrictions lapsed.

We turn now to that factual question: whether petitioners' stock was substantially nonvested when they received it and remained so until the putative restrictions lapsed on January 1, 2004. The requirement that an employee perform future services as a condition of obtaining full enjoyment of restricted property is

[*20] sometimes called an "earnout" restriction. See Campbell v. Commissioner, T.C. Memo. 1990-162, 59 T.C.M. (CCH) 236, 251-252, aff'd in part, rev'd in part, 943 F.2d 815 (8th Cir. 1991). In our previous Opinion in these cases, we ruled that an earnout restriction "creates a 'substantial risk or forfeiture' if there is a sufficient likelihood that the restriction will actually be enforced." Austin, 141 T.C. at 568. We must now decide whether, as respondent contends, the restriction was unlikely to be enforced here.

Each petitioner owned, directly or through his grantor trust, 47.5% of UMLIC S-Corp.'s voting common stock, with the ESOP owning the remaining 5%. In situations such as this, where nominally restricted property is transferred to an employee "who owns a significant amount of the total combined voting power or value of all classes of stock of the employer corporation," the regulations direct us to consider several factors "[i]n determining whether the possibility of forfeiture is substantial." Sec. 1.83-3(c)(3), Income Tax Regs. These factors include "the employee's relationship to other stockholders"; the extent of the other stockholders' "control, potential control and possible loss of control of the corporation"; "the position of the employee in the corporation"; his "relationship to the officers and directors of the corporation"; the identity of "the person or persons

**[*21]** who must approve * * * [his] discharge"; and "past actions of the employer in enforcing" the restrictions.  Ibid.

This regulation emphasizes the importance, not just of percentage stock ownership, but of de facto power to control.  An example included in the regulation assumes that the president of a company owns only 4% of its voting power, but that "the remaining stock is so diversely held by the public that the president, in effect, controls the corporation."  Id.  Under these circumstances, "the possibility of the corporation enforcing a restriction on rights in property transferred to the president is not substantial, and such rights are not subject to a substantial risk of forfeiture."  Ibid.

In the cases before us, the question is whether, if either petitioner had quit his job before the end of the five-year earnout period, UMLIC S-Corp. would likely have enforced the restriction requiring that he thereupon forfeit 50% of the value of his shares.  Evaluating the facts in light of the factors set forth in the regulations, we conclude that the answer to this question is "yes."

Petitioners had been business associates for 10 years before forming UMLIC S-Corp.  While both had experience in the loan servicing industry, their skill sets were quite distinct.  Mr. Austin performed the front-end work:  acquiring loan portfolios, doing due diligence in evaluating these portfolios, formulating

[*22] bidding strategies, performing cashflow analysis, and maintaining investor relationships. Mr. Kechijian had back-end and back-office responsibilities: servicing loan portfolios, collection, general operations, and human resources. Petitioners recognized that the success of their business depended on their both remaining with the company. To incentivize this, they executed reciprocal agreements whereby each would lose 50% of the value of his stock if he left the company within five years. Petitioners thus "tied each other to the mast" for a five-year period.

Removal or waiver of this forfeiture provision required the consent of the holders of 100% of the company's shares. As a holder of a 47.5% interest facing the holder of another 47.5% interest, neither petitioner had power to control the company. Neither petitioner could act unilaterally to remove the forfeiture restriction affecting his stock.

If either petitioner threatened to leave during the five-year earnout period, the other had a strong incentive to insist that the forfeiture restriction be enforced as written. First, given the complementary nature of their responsibilities and skill sets, it was in each petitioner's economic interest to have the other remain with the company. Second, if the departing petitioner forfeited 50% of the value of his stock, the value of the remaining petitioner's stock (and that of the ESOP) would

[*23] be increased accordingly. There was no family or other relationship between petitioners that would have caused either of them to act against his economic interest.[7]

Conceivably, both petitioners might have decided independently that they wished to retire early instead of serving out their promised five-year terms. But despite their status as the sole directors of the company, they would have needed the consent of the ESOP to remove the forfeiture provisions. For two reasons, the ESOP would have had a strong economic incentive to refuse such consent. First, if petitioners left the company, the company might well fold, and the ESOP bene-ficiaries would then lose their jobs. Second, if petitioners forfeited 50% of the value of their stock, the value of the ESOP's stock would be increased astronom-ically.

Respondent urges that petitioners could control the ESOP because they served as two of its initial three trustees and Mr. Faber (the third trustee) was sub-ordinate to them. But respondent ignores the fiduciary duties that all three owed

---

[7]Respondent notes that petitioners "acted in unison" with respect to most corporate matters during 1998-2004. But on virtually all these matters their busi-ness interests were closely aligned. This track record does not suggest that peti-tioners would "act in unison" on a multi-million-dollar matter with respect to which their economic interests were diametrically opposed.

**[*24]** the ESOP.  Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. secs. 1104(a)(1), 1106(b) (2012), the plan's trustees were required to refrain from self-dealing in the plan's assets for their own benefit and to "discharge * * * [their] duties * * * with the care, skill, prudence, and diligence * * * that a prudent man acting in a like capacity * * * would use."  As trustees, petitioners were personally liable for any breaches of their fiduciary duty.  Id. sec. 1109.

Mr. Austin, Mr. Faber, and Mr. Hoehn (the successor trustee) all credibly testified that they understood their fiduciary obligations to the ESOP.  When called upon to vote on the 2003 sale of UMLIC S-Corp.'s assets to Holdings, the ESOP retained outside counsel that diligently protected its interests.  In advance of that vote, petitioners resigned as trustees of the ESOP in order to prevent a conflict of interest.

Because approving removal of the forfeiture provision affecting either petitioner's shares would have been directly contrary to the economic interest of the ESOP, it would have been a grotesque conflict of interest for petitioners to have acted as ESOP trustees for such a vote.  We are confident that petitioners in such circumstances would have resigned as trustees, as they in fact did in 2003, rather than face the consequences of a self-dealing charge.  The ESOP used a pass-through voting system whereby participants voted confidentially through a third

[*25] party, who directed the trustees to vote in accordance with the participants' majority vote. The participants would thus have been uninhibited in voting their economic interest, which would plainly have dictated a vote against waiver of the forfeiture provision.[8]

Respondent urges that petitioners' stock was substantially vested on issuance in light of "the person or persons who must approve the employee's discharge." Sec. 1.83-3(c)(3), Income Tax Regs. Under the peculiar drafting of the RSAs and the employment agreements, the event that would trigger stock forfeiture was a "discharge for cause," with "cause" consisting of the employee's refusal to continue working for the promised five-year term. See Austin, 141 T.C. at 566-568. Respondent urges that either petitioner, as one of the company's two directors, could have blocked his being "discharged for cause." But the company's bylaws allowed a director to be removed by a majority vote of shares. If either pe-

---

[8]Respondent urges that petitioners, as the sole directors of UMLIC S-Corp., had the power to amend the RSAs and the employment agreements. Petitioners in fact amended these documents in December 1998 and January 2004 to add new provisions addressing the sale of a disabled or deceased shareholder's stock. These amendments were minor; they affected both petitioners equally and did not adversely affect the ESOP. By contrast, it was in neither petitioner's economic interest to acquiesce in removing the forfeiture restriction affecting the other's shares. And if both petitioners wished to depart simultaneously, the ESOP had a powerful economic incentive to exercise its rights to ensure that the forfeiture provisions were enforced according to their terms.

[*26] titioner announced his intention to quit prematurely, the other petitioner could have combined with the ESOP to remove the former as a director and then discharge him for cause.

Respondent also urges that the forfeiture restriction was unlikely to be enforced in light of "past actions of the employer in enforcing * * * the restriction[]." Sec. 1.83-3(c)(3), Income Tax Regs. In March 2003 petitioners formed Rescomm Holdings (Rescomm), a limited partnership that held certain loan portfolios outside the UMLIC S-Corp. structure. In respondent's view, Rescomm competed with UMLIC S-Corp. in the business of servicing loan portfolios, in alleged violation of the RSA whereby each petitioner agreed "not to carry on or engage in * * * any business or other activity in competition with the business of [the company]." Respondent contends that this alleged breach of the RSA by petitioners would have justified the company in invoking the forfeiture provision, which it did not do.

We do not find this argument persuasive. At trial Mr. Hoehn credibly testified that Rescomm was formed as a temporary vehicle for holding loan portfolios financed by one of UMLIC S-Corp.'s usual lenders, Varde Partners (Varde). This was precipitated by the entry of a judgment against UMLIC S-Corp. on an old loan, which caused Varde to decline (for a brief period) to finance any new loan

[*27] portfolios owned by the UMLIC entities. For that reason, loan portfolios that Varde wanted to finance were placed in Rescomm instead, but UMLIC S-Corp. continued to service these loans.[9]

The formation and operation of Rescomm did not cause petitioners to "compete" with UMLIC S-Corp. in violation of the RSA. UMLIC S-Corp. could not compete to hold the portfolios that Varde financed, because Varde at the time would not allow UMLIC S-Corp. to hold them. And because UMLIC S-Corp. continued to service these loans, the Rescomm maneuver, far from depriving UMLIC S-Corp. of a business opportunity, actually allowed it to earn servicing income that it could not otherwise have earned. In effect, the formation of Rescomm was an accommodation to one of UMLIC S-Corp.'s commercial associates that enabled the parties to continue business as usual despite a temporary contretemps in their relationship. This assuredly did not give rise to an event of forfeiture under the RSA.

Finally, respondent errs in relying on QinetiQ U.S. Holdings, Inc. & Subs. v. Commissioner, T.C. Memo. 2015-123, 110 T.C.M. (CCH) 17, aff'd, 845 F.3d 555 (4th Cir. 2017). We there held, and the Court of Appeals agreed, that stock

---

[9]The problem with Varde was apparently resolved six months later. In November 2003 the portfolios held by Rescomm were transferred to Holdings.

[*28] issued by an S corporation to a 49.75% shareholder was not transferred to him "in connection with the performance of services" and was not subject to "a substantial risk of forfeiture." Ibid. In so holding, we relied on the fact that the shareholder had received, for all years at issue, allocations of income and losses from the S corporation "as if he was the owner of * * * fully vested and outstanding stock." Qinetiq, 110 T.C.M. (CCH) at 24. Indeed, the taxpayer stipulated that, if the shareholder were called to testify, he would testify that his ownership of the stock was unrestricted, as he and his employer had both represented on their Federal tax returns. Qinetiq, 110 T.C.M. (CCH) at 21. On these critical factual points, the facts of the instant cases are precisely the opposite of those in QinetiQ.

In sum, we conclude that petitioners' stock was subject to a substantial risk of forfeiture when issued to them in 1998 and remained subject to that risk until the restrictions lapsed on January 1, 2004. Neither petitioner held a controlling position in UMLIC S-Corp. If either failed to perform his duties or left the company before the earnout restriction ended, the other would have had every incentive to insist on enforcement of the forfeiture provision according to its terms. The ESOP had (if anything) even stronger economic incentives to do this. Because "the possibility of forfeiture * * * [was] substantial," sec. 1.83-3(c)(3), Income

[*29] Tax Regs., the stock held by petitioners and their grantor trusts did not become "substantially vested" until petitioners completed their promised service through the five-year earnout period.

## II.    Economic Substance of S Corporation/ESOP Structure

Taxpayers generally are free to structure their business transactions as they wish, even if motivated in part by a desire to reduce taxes.  Gregory v. Helvering, 293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 196 (1983), aff'd on this issue, 752 F.2d 89 (4th Cir. 1985).  However, a trans-action that lacks business purpose apart from tax avoidance may be treated as a sham and disregarded for Federal income tax purposes.  Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Rice's Toyota World, Inc., 81 T.C. at 196.  The eco-nomic substance of a transaction, rather than its form, controls.  Frank Lyon Co., 435 U.S. at 583-584; Derr v. Commissioner, 77 T.C. 708 (1981).

The U.S. Court of Appeals for the Fourth Circuit, the appellate venue in these cases absent stipulation to the contrary, has distilled a two-part test for this purpose.  To disregard a transaction, a court must find:  (1) that the taxpayer was motivated by no business purpose other than obtaining tax benefits and (2) that the transaction had no economic substance because it offered no reasonable possibility of profit.  See Rice's Toyota World, Inc., 752 F.2d at 91-92.  The first prong of

**[\*30]** this test is subjective, and the second is objective.  <u>Hines v. United States</u>, 912 F.2d 736, 739 (4th Cir. 1990).  But both prongs are directed to the same question:  "whether the transaction contained economic substance aside from the tax consequences."  <u>Ibid.</u>  Whether a particular transaction or series of transactions should be respected or disregarded presents an issue of fact.  <u>Rice's Toyota World, Inc.</u>, 752 F.2d at 92.

A transaction must fail to pass muster under both prongs of this test in order for the court to disregard the transaction.  <u>Black & Decker Corp. v. United States</u>, 436 F.3d 431, 442-443 (4th Cir. 2006).  In making that determination, we must focus on the "specific transaction[s] whose tax consequences are in dispute" as opposed to the "general business activities of * * * [the] corporation."  <u>Id.</u> at 441.  We will accordingly address separately the transactions whose economic substance respondent challenges.

A.    <u>Incorporation and Operation of UMLIC S-Corp.</u>

Respondent contends that the incorporation of UMLIC S-Corp. in December 1998 as a holding company for the UMLIC entities lacked a legitimate business purpose and was devised solely to avoid taxes.  Respondent points to petitioners' admissions that the company was incorporated as a part of their respective estate tax plans; respondent also notes that the UMLIC entities did not meaning-

[*31] fully change their mode of operations after being placed into the holding company structure. Respondent contends that petitioners' employment with UMLIC S-Corp. was devoid of substance because the company (as opposed to its subsidiaries) did not engage directly in business activities.

We find no merit in these arguments. Petitioners had legitimate business purposes for incorporating UMLIC S-Corp., including reducing the number of financial and tax filings and allowing free movement of assets among the subsidiary entities. It is immaterial that the UMLIC entities continued the same operations after December 1998 and that the holding company did not engage directly in operational activities; this is true of holding company structures throughout our economy. It is also immaterial that petitioners intended to use UMLIC S-Corp. as part of a plan to achieve income tax and estate planning benefits; taxpayers routinely structure business transactions, in part, for these purposes. See Frank Lyon Co., 435 U.S. at 583-584; Gregory, 293 U.S. at 469. Petitioners observed all corporate formalities in creating and operating the holding company structure, and we find that it had economic substance apart from tax considerations.

B.      Formation and Operation of the ESOP

Respondent contends that the ESOP lacked economic substance because it was a mere "accommodation party" that enabled petitioners to defer receipt of in-

[*32] come from UMLIC S-Corp. Petitioners contend that they formed the ESOP properly under the laws in place at the time and that the ESOP provided meaningful benefits not only to them but also to its 101 other employee participants. One may question (and scholars did question) the wisdom of Congress' decision to create the statutory framework of which petitioners took advantage. But that framework did exist (albeit briefly), and petitioners' implementation of it clearly had economic substance. See Summa Holdings, Inc. v. Commissioner, 848 F.3d 779, 790 (6th Cir. 2017) ("The Commissioner cannot fault taxpayers for making the most of the tax-minimizing opportunities Congress created."), rev'g T.C. Memo. 2015-119.

Effective January 1, 1998, certain tax-exempt entities, including ESOPs, became eligible to be shareholders of S corporations. SBJPA sec. 1316(a) (codified as section 1361(c)(6)). Income allocable to an ESOP from an S corporation, moreover, did not constitute "unrelated business taxable income" under section 512(a)(1). See Taxpayer Relief Act of 1997, Pub. L. No. 105-34, sec. 1523, 111 Stat. at 1070-1071 (codified as section 512(e)(3)). And in 1998 (and now), restricted S corporation stock was not considered "outstanding," so that no items of income, loss, deduction, or credit were allocated to such shares. Sec. 1.1377-1(a)(1), Income Tax Regs.

[*33] Taken together, these provisions created a framework under which all the outstanding shares of an S corporation could be owned by an ESOP, making the company's income immune from Federal income tax so long as this structure persisted. This arrangement was well known and frequently used by tax practitioners. See, e.g., Burgess J.W. Raby & William L. Raby, "What Stock Counts--And When?" 79 Tax Notes 741 (1998). Eminent tax scholars called for its repeal. See Joseph G. De Angelis & Daniel L. Simmons, "ESOP-Owned Subchapter S Corporations: A Mistake in Need of a Fix," 82 Tax Notes 1325 (1999); Martin D. Ginsburg, "The Taxpayer Relief Act of 1997: Worse Than You Think," 76 Tax Notes 1790 (1997).

In 2001 Congress amended the Code to attribute to certain non-ESOP shareholders of a closely held S corporation any income allocated by it to an ESOP. See EGTRRA sec. 656(d) (codified as section 409(p)). However, this change was made prospective only. It generally did not apply to plan years before 2005 for an ESOP (like the ESOP in these cases) that existed before 2001. See id.

Respondent does not dispute that the Code, as in effect for 2000-2003, allowed UMLIC S-Corp. to allocate 100% of its income to the ESOP. Indeed, the Secretary's own regulations required this. See sec. 1.1361-1(b)(3), Income Tax Regs. Respondent nevertheless attacks the ESOP's validity on economic sub-

[*34] stance grounds.  He contends that the ESOP was a mere "accommodation party" for petitioners' tax-avoidance plan.  And he contends that petitioners lacked a subjective business purpose because other options (such as a section 401(k) plan) existed for achieving their employee-retention goals.

We are not persuaded.  Although the UMLIC entities previously had a section 401(k) plan in place, petitioners decided that additional incentives were desirable in an effort to retain existing employees, many of whom had years of useful experience.  The Code does not limit employers to a single mode of encouraging retirement income security.

To this end petitioners created and funded the ESOP, whose beneficiaries included all of the company's eligible employees.  The IRS recognized the ESOP as tax-exempt under section 401(a) in a determination letter issued in early 1999.  In a subsequent examination the IRS found the ESOP to be in full compliance with all Code requirements during 1998-2004 and executed a closing agreement to that effect.  Between 1998 and 2004 the ESOP's assets grew in value from $500,000 to $10.4 million.  When its stock was redeemed in June 2004, about $9.1 million of the proceeds inured to the benefit of ESOP participants other than petitioners.  Under these circumstances, respondent has no plausible argument that the ESOP "lacked economic substance."

**[\*35]** Respondent contends that the ESOP committed technical footfaults in tax compliance, filing the wrong IRS form or completing certain forms inaccurately or incompletely. The ESOP is not before us, and we do not address these arguments. The only question relevant here is whether the formation and maintenance of the ESOP had economic substance and served a legitimate business purpose. It clearly did.

### C. Sale of UMLIC S-Corp.'s Assets to Holdings

Respondent likewise challenges on "economic substance" grounds the November 2003 sale of UMLIC S-Corp.'s operating assets to Holdings. Respondent discerns a tax-avoidance motivation for this transaction: It enabled UMLIC S-Corp. to realize its built-in gain and allocate 100% of that gain to the ESOP while the ESOP remained its only outstanding shareholder. Concurrently, Holdings acquired a stepped-up basis of $190 million in the transferred assets for purposes of claiming future deductions for depreciation and amortization expense.

At trial Mr. Austin testified that Holdings was formed to facilitate future investment by hedge funds and private equity firms, which petitioners believed would be reluctant to invest in an S corporation partially owned by an ESOP. We also find that, in arranging the sale of UMLIC S-Corp.'s operating assets to a new company they wholly owned, petitioners were motived by a desire to unwind the

[*36] S corporation/ESOP structure they had adopted in 1998. Because of a change in law, that structure was about to lose its luster as a tax-planning device.

We find that petitioners, in both a subjective and an objective sense, had a legitimate business purpose for this transaction. See Rice's Toyota World, Inc., 752 F.2d at 92. The sale of UMLIC S-Corp.'s operating assets to Holdings had real-world consequences. It essentially froze the value of the ESOP, triggering receipt of a fairness opinion and requiring voting approval from the ESOP participants. Revising the structure of petitioners' business in response to a change in law, while in a sense tax-motivated, did not constitute an illegitimate business purpose. The Code permitted UMLIC S-Corp. to elect out of installment treatment, see sec. 453(d)(1), and allocating 100% of the gain to the ESOP, the sole then-outstanding shareholder, was consistent with the governing regulations. See sec. 1.1361-1(b)(3), Income Tax Regs. To the extent that respondent is concerned that Holdings could claim an artificially inflated stepped-up basis in the transferred assets for depreciation and amortization purposes, that concern is addressed by other Code provisions and is not before us.[10]

_____

[10]The sale of UMLIC S-Corp.'s assets to Holdings was an "installment sale" because "at least 1 payment * * * [was] to be received after the close of the taxable year in which the disposition occur[red]." See sec. 453(b)(1). "In the case of an installment sale of depreciable property between related persons," section

(continued...)

**[*37]** III.     Stock Surrender and Repurchase

Respondent aims his "economic substance" arrow at a more promising target when he attacks the "surrender" and "repurchase" transactions that petitioners executed in March 2004.  On January 1, 2004, the restrictions on petitioners' stock expired, and they became fully vested owners of their shares.  Section 83 requires that the excess of the FMV of restricted property at the time it becomes substantially vested over the amount (if any) paid for the property be reported as compensation income to the employee for the taxable year in which the restrictions lapse.  The parties agree that the FMV of 47,500 shares of New UMLIC S-Corp. stock on January 1, 2004, was $45,857,434.  The parties likewise agree that each petitioner's cost basis in his shares was $142,566.  Under section 83 each petitioner was thus required to report on his 2004 return compensation income of $45,714,868.

---

[10](...continued)
453(g)(1)(C) generally provides that "the purchaser may not increase the basis of any property acquired in such sale by any amount before the time such amount is includible in the gross income of the seller."  An exception is available "if it is established to the satisfaction of the Secretary that the disposition did not have as one of its principal purposes the avoidance of Federal income tax."  Sec. 453(g)(2).  We have no occasion in these cases to decide how these provisions would apply where (as here) the seller's only outstanding shares were owned by a tax-exempt entity, and the seller elected out of the installment method.  (Documents included in the record of these cases indicate that Holdings deducted $36.6 million of "loan portfolio amortization" expense on its 2004 Form 1065, U.S. Return of Partnership Income, and that the IRS disallowed this deduction.)

[*38] In an effort to avoid reporting this income, each petitioner in March 2004 entered into simultaneous "surrender" and "subscription" agreements with New UMLIC S-Corp. Under the former agreement each petitioner purported to surrender to the company his 23,000 shares (and the 24,500 shares held by his grantor trust) in exchange for no consideration. Under the latter agreement each petitioner purported to repurchase 47,500 identical shares, with an agreed-upon FMV of $46 million, in exchange for a $41.5 million promissory note. Petitioners contend that each of them was thus required by section 83 to report as compensation for 2004 only $4.5 million, the excess of his repurchased shares' FMV over the face value of his promissory note ($46 million – $41.5 million). The business purpose petitioners alleged for these transactions was avoiding the need for New UMLIC S-Corp. to pay employment taxes on $45,714,868 of compensation to each petitioner.[11]

This argument fails for a variety of reasons. Section 83(a)(1) requires that the FMV of stock be treated as compensation income to the shareholder "at the

---

[11]Section 3121(v)(2) provides that any amount "deferred under a nonqualified deferred compensation plan" is taken into account for employment tax purposes on the later of: (1) the date on which the services are performed or (2) the date on which there is no longer a substantial risk of forfeiture. Accordingly, New UMLIC S-Corp. was required to pay employment taxes on the amounts petitioners were required to include in income as wages for 2004. See sec. 31.3121(v)(2)-1(e)(1), (3), Employment Tax Regs.

**[\*39]** first time" the stock becomes substantially vested. See, e.g., Culp v. Commissioner, T.C. Memo. 1989-517; see also Mitchell v. Commissioner, T.C. Memo. 1990-617, aff'd without published opinion, 992 F.2d 1219 (9th Cir. 1993). That occurred on January 1, 2004, and section 83 requires a "snapshot" valuation as of that date. Petitioners stipulated that the value of the stock each owned on January 1, 2004, directly or through his grantor trust, was $45,857,434. Each thus received taxable compensation in excess of $45 million at that time. Neither could unring this bell by subsequent actions with respect to the stock, whether that action consisted of sale to a third party or surrender to the corporation.[12]

In any event, it is clear that the simultaneous "surrender" and "repurchase" transactions were palpably lacking in economic substance. Applying the two-part test in Rice's Toyota World, Inc., 752 F.2d at 91, we must first determine whether petitioners, in surrendering and immediately repurchasing their stock, were "moti-

[12]Nor can either petitioner contend that the $41.5 million promissory note (if bona fide) would offset this income inclusion. Section 83(a)(2) reduces the snapshot value of the formerly restricted stock by "the amount (if any) paid for such property," and "amount paid" refers to what was paid "for the transfer of property to which section 83 applies." Sec. 1.83-3(g), Income Tax Regs. If the promissory note were thought to have economic substance, it was paid, not for the original restricted shares, but for the replacement shares. All of the restrictions lapsed on January 1, 2004; since either petitioner could have sold his stock to a third party during the intervening three-month period, the replacement shares received on March 30, 2004, cannot have been restricted stock that was "transferred in connection with the performance of services." See sec. 1.83-3(f), Income Tax Regs.

[*40] vated by no business purposes other than obtaining tax benefits." We determine petitioners' subjective motive by examining the objective evidence before us. See Hunt v. Commissioner, 938 F.2d 466, 472 (4th Cir. 1991), aff'g T.C. Memo. 1989-660. A taxpayer may demonstrate a valid business purpose by showing that the transaction was "rationally related to a useful nontax purpose that is plausible in light of the taxpayer's conduct and * * * economic situation." ACM P'ship v. Commissioner, T.C. Memo. 1997-115, 73 T.C.M. (CCH) 2189, 2217, aff'd in part, rev'd in part, 157 F.3d 231 (3d Cir. 1998).

On the record before us, we find that petitioners' execution of the "surrender" and "subscription" agreements was motivated by no purpose apart from tax avoidance. The only business purpose Mr. Austin could suggest for these transactions was avoidance of the need to pay employment taxes. That is in itself a tax-avoidance purpose.[13] And by admitting that petitioners sought to avoid payment of employment taxes, Mr. Austin in effect admitted that they sought to avoid

---

[13]We did not find credible Mr. Austin's testimony that neither the company nor petitioners had the financial ability to pay the employment taxes during 2004. Petitioners' businesses were thriving at this time, and each petitioner had net worth in excess of $20 million. The company had no difficulty redeeming the ESOP's shares for $10.4 million in June 2004 and paying a $35 million dividend one week later. These were both voluntary payments; the assertion that the company at this time could not afford to make legally required payments of employment taxes is preposterous.

[*41] payment of income taxes, because the former would not be payable unless the latter were payable also. Petitioners have thus failed to demonstrate that these transactions were "rationally related to a useful nontax purpose." ACM P'ship, 73 T.C.M. (CCH) at 2217.

The second prong of the test in Rice's Toyota World, Inc., 752 F.2d at 94, "requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from tax benefits." See also Gefen v. Commissioner, 87 T.C. 1471, 1490 (1986). Neither petitioner could envision a reasonable possibility of profit by surrendering, for no consideration, stock worth $45.8 million. And no rational person would incur indebtedness of $41.5 million to acquire stock that he already owned free and clear. Those notes themselves lacked economic substance: Each petitioner then owned a 50% interest in New UMLIC S-Corp., so each was in effect issuing, for no rational business purpose, a $41.5 million promissory note to himself.

For these reasons, we find that the "surrender" and "repurchase" transactions lacked economic substance in both a subjective and an objective sense. We accordingly hold that each petitioner must include in gross income for 2004 the FMV of his New UMLIC S-Corp. shares, as of the date the earnout restriction lapsed, to the extent that value exceeded his basis in those shares. For each

**[\*42]** petitioner that sum is $45,714,868 (of which he previously reported $4.5 million).[14]

IV.    Taxability of Special Dividend

On June 20, 2004, New UMLIC S-Corp. declared and paid a "special dividend," supra p. 13, of $35 million:  $8.47 million to each petitioner and $9.03 million to each petitioner's grantor trust.  Petitioners treated these distributions as nontaxable, theorizing that their $41.5 million promissory notes afforded them basis in excess of the distributions.  We reject that argument, having found the notes to lack economic substance.  Cf. Bergman v. United States, 174 F.3d 928, 932-933 (8th Cir. 1999); Oren v. Commissioner, T.C. Memo. 2002-172, 84 T.C.M. (CCH) 50, 57, aff'd, 357 F.3d 854 (8th Cir. 2004).  Even if the notes did have economic substance, it is questionable whether petitioners would receive a basis increase where they in effect issued the notes to themselves without subjecting themselves to an increased risk of economic loss.

---

[14]Under section 83(h), UMLIC S-Corp. would presumably be entitled to a deduction equal to the amount petitioners must include in gross income under section 83(a).  This deduction would consequently affect petitioners' pro rata shares of income from the company as reported on their Schedules K-1.  We leave any applicable tax consequences to the parties' Rule 155 computations.

[*43] However, the $45,714,868 income inclusion under section 83, as determined in the previous section, did afford petitioners a basis increase. Section 1.83-4(b)(1), Income Tax Regs., provides that, "if property to which section 83 * * * appl[ies] is acquired by any person * * * while such property is still substantially nonvested, such person's basis for the property shall reflect any amount paid for such property and any amount includible in the gross income of the person who performed the services." Petitioners performed the relevant services and, upon lapse of the stock restrictions, $45,714,868 was includible in each petitioner's gross income.[15] Each petitioner's basis in his New UMLIC S-Corp. shares was thus increased by $45,714,868.[16]

---

[15]Respondent asserts that each petitioner could be entitled to a basis increase only for the amount, $4.5 million, that he actually included in gross income under section 83 on his 2004 return. But the regulations explicitly state that, upon lapse of the restrictions, the shareholder's basis "shall reflect * * * any amount includible in the gross income of the person who performed the services." Sec. 1.83-4(b)(1), Income Tax Regs. (emphasis added). Under section 83 and this opinion, $45,714,868 was "includible" in each petitioner's income for 2004 and must therefore be added to basis.

[16]Under the applicable ordering rules, any potential basis adjustments attributable to UMLIC S-Corp.'s section 83(h) deduction would be made after the $45,714,868 increase attributable to the section 83 inclusion and any decreases attributable to the special dividends. Any such adjustments would have no effect on the result we reach in these cases.

[*44] Under section 1368(b), a distribution from an S corporation with no accumulated earnings and profits (E&P) is not included in the gross income of a shareholder to the extent it does not exceed the adjusted basis of his stock. Because UMLIC S-Corp. was always an S corporation, it had no accumulated E&P. See Williams v. Commissioner, 110 T.C. 27, 30 (1998). After adding $45,714,868 to basis and making all other basis adjustments required by sections 1366-1368, each petitioner had an adjusted basis in his New UMLIC S-Corp. shares well in excess of $17.5 million. The $17.5 million dividend paid to each petitioner and his grantor trust was thus nontaxable.

## V. Penalties

The Code imposes a 20% penalty upon the portion of any underpayment of income tax that is attributable to (among other things) "negligence" or any "substantial understatement of income tax." Sec. 6662(a) and (b)(1) and (2). "Negligence" is defined as "any failure to make a reasonable attempt to comply" with the provisions of the Code. Sec. 6662(c). An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. See sec. 6662(d)(1)(A).

Under section 7491(c) the Commissioner bears the burden of production with respect to the liability of an individual for any penalty. See Higbee v. Com-

[*45] missioner, 116 T.C. 438, 446 (2001).  No penalties are due for tax years 2000-2003 because there are no deficiencies for those years.  Respondent has met his burden of production for 2004 with respect to petitioners' negligence and disregard of rules and regulations by showing that each petitioner failed to report $41,214,868 of income with respect to his New UMLIC S-Corp. stock.  The understatements of income tax attributable to those excluded income items exceed both $5,000 and 10% of the tax required to be shown on each return.  The burden thus shifts to petitioners to prove that the penalties do not apply for 2004.  See id. at 447.

Section 6664(c)(1) provides that the accuracy-related penalty shall not be imposed with respect to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith" with respect to it.  The decision as to whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances.  See sec. 1.6664-4(b)(1), Income Tax Regs.  Generally, the most important factor in determining the existence of reasonable cause is the taxpayer's effort to ascertain his correct tax liability.  Circumstances that may signal reasonable cause and good faith "include an honest misunderstanding of fact or law that is reasonable in light of all the facts and circum-

**[\*46]** stances, including the experience, knowledge, and education of the taxpayer." Ibid.

For purposes of section 6664(c), a taxpayer may be able to establish reasonable cause and good faith by showing reliance on the advice of a professional tax adviser. Sec. 1.6664-4(b)(1), Income Tax Regs. To establish reasonable cause and good faith through reliance on the advice of a professional tax adviser, the taxpayer must prove that: (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

In his trial testimony Mr. Austin did not aver that he or Mr. Kechijian had relied on the advice of a tax professional in connection with the "surrender" and "repurchase" transactions or in reporting $4.5 million, rather than $45.7 million, as compensation income on his 2004 tax return. Indeed, petitioners state in their answering brief that "Mr. Austin and Mr. Kechijian have never asserted a 'reliance on tax professionals' defense" in these cases.

Petitioners were sophisticated businessmen with extensive experience in financial markets and complex tax planning. The objective of the tax planning in

[*47] which they engaged was to defer until 2004 their obligation to report income in connection with the business activities of the UMLIC entities. Petitioners knew that they would be required to report substantial income when the restrictions on their stock lapsed on January 1, 2004. Even if they had secured an opinion that this requirement would disappear if they exchanged their 47,500 shares for 47,500 identical shares, it is hard to imagine that such an opinion would pass the straight-face test.

Petitioners' overall conduct shows that they were fully aware of the tax consequences of their stock's becoming substantially vested on January 1, 2004. They structured the surrender and repurchase transactions in order to avoid having to report income they knew to be taxable. In so doing, they did not act under an "honest misunderstanding of fact or law" that was reasonable under all the circumstances.

We find that petitioners did not act with reasonable cause and good faith in failing to include in gross income on their 2004 returns the full value of their New UMLIC S-Corp. stock. Accordingly, we find that the portion of each underpayment stemming from this failure was attributable to negligence. And because petitioners' understatements of income tax for 2004 far exceed the greater of $5,000 or 10% of the amount required to be shown on their returns, we conclude

**[\*48]** that the underpayments are alternatively attributable to substantial under-statements of income tax for which petitioners have not shown reasonable cause.

To reflect the foregoing,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.