**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-2277

ESTATE OF ARTHUR E. KECHIJIAN, DECEASED; SUSAN P. KECHIJIAN,
individually and as co-executor; SCOTT E. HOEHN, co-executor,

Petitioners – Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent – Appellee.

No. 18-2402

LARRY E. AUSTIN; BELINDA AUSTIN,

Petitioners – Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE,

Respondent - Appellee.

Appeals from the United States Tax Court. (Tax Ct. Nos. 8967-10; 8966-10)

Submitted:  May 8, 2020                                    Decided:  June 23, 2020

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

_____

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge King joined.

_____

Lynn F. Chandler, Stephanie C. Daniel, Lucas D. Garber, SHUMAKER, LOOP & KENDRICK, LLP, Charlotte, North Carolina, for Appellants. Richard E. Zuckerman, Principal Deputy Assistant Attorney General, Richard Farber, Jennifer M. Rubin, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

WILKINSON, Circuit Judge:

This case concerns the federal income tax consequences arising from a complex set of business transactions orchestrated by petitioners Arthur Kechijian and Larry Austin.[1] The IRS Commissioner maintains that petitioners substantially underreported their taxable income for the 2004 tax year. After a trial, the Tax Court agreed. It held that petitioners had failed to report approximately $41.2 million of compensation income that they realized when certain restricted stockholdings that they owned became substantially vested in January 2004. The Tax Court also upheld the Commissioner's decision to impose accuracy-related penalties for negligence and substantial understatement of tax liability, and it denied petitioners' post-trial attempt to offset their underreported income with various net operating loss carrybacks. Petitioners challenge each of these holdings. After careful review of the record, we find no error in the Tax Court's rulings and accordingly affirm its judgment. Petitioners cannot be allowed to proceed on any assumption that the sheer complexity of their corporate transactions will assist them in the evasion of their appropriate tax liability.

I.

A.

Petitioners were partners in the distressed debt loan portfolio business for approximately fifteen years, beginning in 1990. At the most basic level, petitioners'

---

[1] Arthur Kechijian died in 2013; his estate was substituted as a party petitioner on October 23, 2013. Petitioners' wives, Belinda Austin and Susan Kechijian, are also parties to this action by virtue of having filed joint federal income tax returns with their husbands.

business entailed raising funds from outside investors to finance the acquisition of distressed debt from financial institutions and government agencies. Corporate entities controlled by petitioners would then own and service that debt. Each man brought a different set of skills to their partnership. Austin performed "front-end work," such as acquiring loan portfolios, conducting due diligence on potential acquisitions, formulating bid strategies, performing cashflow analyses, and maintaining investor relationships. On the other hand, Kechijian performed "back-end work," including servicing the loan portfolios, collection activities, human resources, and other back-office operations.

In 1998, petitioners reorganized their business. Prior to that year, petitioners were the owners and operators of a group of corporations and limited liability companies ("LLCs") known as the "UMLIC entities." Petitioners decided to consolidate the separate UMLIC entities into a single holding company known as UMLIC Consolidated, Inc. (the "UMLIC S-Corp."). UMLIC S-Corp. was a North Carolina corporation for which petitioners elected so-called "S corporation status." The goals of this restructuring were threefold: (1) allowing assets to be moved more efficiently between the various entities; (2) reducing the number of tax and financial filings the businesses were required to make; and (3) achieving substantial tax benefits.

To effectuate the contemplated reorganization, petitioners executed a series of transactions relevant to the instant case. First, each man transferred the entirety of his shareholdings in the UMLIC entities, each valued at $142,566, to UMLIC S-Corp. in return for 47,500 shares of UMLIC S-Corp. common stock. Simultaneously, petitioners executed two collateral agreements, the Restricted Stock Agreement ("RSA") and the Employment

4

Agreement ("EA"). Taken together, these agreements provided that either petitioner would lose at least 50% of the value of his UMLIC S-Corp. stock if he voluntarily terminated his employment with the company before January 1, 2004. This five-year "earnout" period was designed to incentivize petitioners to continue working for UMLIC S-Corp. so that the new company would benefit from their diverse skill sets.

The ownership of UMLIC S-Corp. was further divided over the next few years. In December 1998, petitioners created an employee stock ownership plan ("ESOP") for UMLIC S-Corp. The ESOP purchased 5,000 shares of UMLIC S-Corp. common stock at a price of $500,000. In August 1999, petitioners each transferred 24,500 shares of their UMLIC S-Corp. stock to two new, irrevocable trusts established for the benefit of their families. These shares remained subject to the RSA and EA. Thus, as of August 1999, petitioners, their trusts, and the ESOP were the only shareholders of UMLIC S-Corp.

As alluded to above, petitioners had an additional, non-business motive for creating this elaborate corporate shareholding structure, namely the deferral of federal income tax on the profits of UMLIC S-Corp. Four background principles are necessary to understand this intricate scheme. First, I.R.C. § 83 applies where property, including stock, is transferred to a taxpayer "in connection with the performance of services." At the taxpayer's election, he may defer tax inclusion of any gains from such a transfer until the first taxable year in which his rights in the property "are not subject to a substantial risk of forfeiture," 26 U.S.C. § 83(a), *i.e.*, when his rights become "substantially vested," 26 C.F.R. § 1.83-1. Importantly, such rights "are subject to a substantial risk of forfeiture if . . . [they] are conditioned upon the future performance of substantial services by any

5

individual." 26 U.S.C. § 83(c)(1). Second, under the Internal Revenue Code ("IRC"), an S corporation does not itself pay income taxes; rather, it passes any income or losses it makes through to its outstanding shareholders who must then report the same on their individual income tax returns. Third, restricted stock in an S corporation "that is issued in connection with the performance of services . . . and that is substantially nonvested . . . is not treated as outstanding stock of the corporation" for tax purposes. 26 C.F.R. § 1.1361-1(b)(3). As such, profits or losses of an S corporation will *not* flow through to a holder of non-vested stock and need not be included on the holder's individual income tax returns. Fourth, an ESOP is a tax-exempt entity.

In combination, these principles allowed petitioners to avoid reporting any income from UMLIC S-Corp. on their federal tax returns from 2000 to 2003, despite the fact that the company was profitable during that period. The Tax Court aptly summarized the functioning of this scheme: "[petitioners] took the position that their stock (and that owned by their grantor trusts) was subject to a 'substantial risk of forfeiture' and was thus 'substantially nonvested' . . . . Because the 95,000 shares owned by petitioners and their grantor trusts were deemed to be 'non-outstanding,' UMLIC S-Corp. for tax years 2000–2003 allocated 100% of its income, losses, deductions, and other tax items to the ESOP. Consistently with the company's reporting, neither petitioner reported any flow-through items from UMLIC S-Corp. on the joint return he filed with his spouse for 2000, 2001, 2002, or 2003. And because the ESOP was a tax-exempt entity, it likewise reported no taxable income from UMLIC S-Corp. for 2000–2003." *Austin v. Comm'r*, T.C. Memo.

2017-69, at *14–15.  In other words, between 2000–2003, no one paid any federal income tax on UMLIC S-Corp.'s profits.

In late 2003, petitioners again undertook to restructure their business operations. This second reorganization was undertaken for two purposes.  First, petitioners hoped to attract greater outside investment from hedge funds and private equity firms, which they felt would be difficult while the business continued to operate as an S corporation.  Second, Congress had amended the tax laws to close the loophole by which petitioners had avoided reporting taxable income on the earnings of UMLIC S-Corp.  As such, the existing structure would cease to provide tax benefits as of January 1, 2005.

To effectuate this restructuring, petitioners formed UMLIC Holdings, LLC ("Holdings"), a Delaware limited liability corporation in which petitioners each held a 50% interest.  In November 2003, Holdings purchased all of UMLIC S-Corp.'s operating assets in exchange for a $190 million interest-bearing promissory note and the assumption of various liabilities.  Though UMLIC S-Corp. realized $174.6 million of capital gain on this sale, it allocated the entirety of that gain to the tax-exempt ESOP, which, according to petitioners, was still the only outstanding shareholder of UMLIC S-Corp.

On January 1, 2004, the restrictions imposed by the RSA and EA on petitioners' UMLIC S-Corp. stock lapsed and their shares became fully vested.  At this point, the fair market value of the shares held by each petitioner and his respective trust was approximately $45.9 million. But petitioners did not hold these shares for long.  On March 30, 2004, petitioners entered into identical "surrender" and "subscription" agreements with UMLIC S-Corp. (the "Surrender Transactions").  Pursuant to the Surrender Transactions,

7

petitioners purported to (1) return the entirety of their newly vested shares to UMLIC S-Corp. and (2) simultaneously repurchase 47,500 identical shares from UMLIC S-Corp. in exchange for a $41.5 million promissory note. On their 2004 income tax returns, petitioners reported $4.5 million in compensation income from this series of transactions, which represented the difference between the fair market value of the new UMLIC S-Corp. shares and the price paid to purchase those shares, *i.e.*, the $41.5 million promissory notes.

On June 22, 2004, UMLIC S-Corp. redeemed the 5,000 shares owned by the ESOP at a price of approximately $10.4 million. At that point, UMLIC S-Corp. became entirely owned by petitioners and their trusts. It continued to operate in this manner until the petitioners' business failed during the 2008 financial crisis.

B.

The IRS examined petitioners' income tax returns for the years 2000–2004. In the course of its investigation, the IRS concluded that petitioners had underreported their tax liability and significantly underpaid tax over that five-year period. Consequently, on January 15, 2010, the IRS issued timely notices of deficiency to petitioners. As relevant here, the IRS asserted that: (1) petitioners' stock in UMLIC S-Corp. was substantially vested upon receipt in 1998, such that petitioners were required to report their pro rata shares of the company's income each year; and (2) even if the stock did not substantially vest until the RSA restrictions lapsed in January 2004, petitioners should have reported the fair market value of that stock as taxable income in 2004, notwithstanding their purported "surrender" of the shares. The IRS also assessed accuracy-related penalties for negligence and substantial understatement of tax liability for all five years. Petitioners disputed the

8

IRS's findings and sought redetermination in the Tax Court. Their case eventually proceeded to trial in 2015.

The Tax Court resolved the first issue in petitioners' favor. Specifically, it held that petitioners' UMLIC S-Corp. stock remained subject to a substantial risk of forfeiture until the RSA restrictions lapsed. See *Austin*, T.C. Memo. 2017-69, at \*28. And because petitioners' shares were not substantially vested between 2000–2003, they were not required to report the company's income on their individual returns during that period.

But petitioners did not get off scot-free. The Tax Court agreed with the IRS that "[s]ection 83(a)(1) requires that the [fair market value] of stock be treated as compensation income to the shareholder at the first time the stock becomes substantially vested." *Austin*, T.C. Memo. 2017-69, at \*38–39 (internal quotation marks omitted). As such, when petitioners' stock vested on January 1, 2004, they each "received taxable compensation in excess of $45 million at that time" and could not "unring this bell by subsequent actions with respect to the stock, whether that action consisted of sale to a third party or surrender to the corporation." *Id.* at \*39. Likewise, the Tax Court concluded that both the Surrender Transactions and the promissory notes delivered to UMLIC S-Corp. as part of those Transactions were "palpably lacking in economic substance" and should be disregarded in calculating tax liability. *Ibid*. This because, according to the Tax Court, the Transactions were undertaken for no purpose other than avoiding tax liability and had no reasonable possibility of generating an economic profit. *Id*. at \*39–41. Thus, the Tax Court held that petitioners each were required to include compensation income of approximately $45.7

9

million for tax year 2004,[2] and it upheld the Commissioner's decision to impose accuracy penalties for that year. See *id.* at *44–48.

The Tax Court then ordered the parties to file computations under Tax Court Rule 155 regarding the exact tax liability owed by petitioners. As relevant here, in filing their computations, petitioners asserted that they had sustained various net operating losses ("NOLs") in taxable year 2008 and that they had permissibly carried back those losses to taxable year 2003. They further maintained that they should now be permitted to carry those NOLs forward to taxable year 2004 to offset some of the tax liability resulting from the Tax Court's decision. The Tax Court rejected this argument on the grounds that "[a]n NOL carryback or carryforward claim is a new issue that cannot be raised for the first time in a Rule 155 proceeding." J.A. 1578.

Finally, on August 28, 2018, the Tax Court issued an order setting the Austins' deficiency in 2004 income tax due at $1,665,619, J.A. 1641, and the Kechijians' at $1,835,130, J.A. 1639. The court also imposed accuracy-related penalties on the Austins in the amount of $333 thousand, J.A. 1642, and on the Kechijians in the amount of $367 thousand, J.A. 1640. This appeal followed.

---

[2] The Tax Court arrived at this figure by subtracting petitioners' basis in their UMLIC S-Corp. shares, which was $142,566, from the fair market value of those shares on January 1, 2004, which was $45,857,434. *Austin*, T.C. Memo. 2017-69, at *37. Because petitioners reported $4.5 million of income on their UMLIC S-Corp. shares in 2004, the total amount of income that they each failed to report was $41,214,868. *Id.* at *44.

II.

Petitioners challenge two aspects of the Tax Court's decision: (1) that the court erred in holding that petitioners each realized and were required to report $45.7 million of taxable income when their UMLIC S-Corp. stock substantially vested in taxable year 2004 and (2) that the court erred in upholding the accuracy-related penalties imposed by the Commissioner.

We review the Tax Court's decisions "on the same basis as decisions in civil bench trials in United States district courts," that is "[q]uestions of law are reviewed de novo, and findings of fact for clear error." *Baxter v. Comm'r*, 910 F.3d 150, 156 (4th Cir. 2018).

A.

Petitioners argue that they were not required to report the $45.7 million in gain that they realized when their UMLIC S-Corp. shares vested. In reaching its contrary holding, the Tax Court noted that a taxpayer realizes compensation income "at the first time" that restricted stock transferred pursuant to I.R.C. § 83 becomes substantially vested, which, in this case, occurred on January 1, 2004. *Austin v. Comm'r*, T.C. Memo. 2017-69, at *39–40 (2017); see also 26 U.S.C. § 83(a)(1). Petitioners do not seriously contest this point. See Petitioners' Opening Br. 15 (acknowledging that petitioners "were in constructive receipt of compensation income on January 1, 2004 when [their shares] became available to them without substantial restrictions"). Instead, they maintain that the subsequent Surrender Transactions effectively negated or reversed their receipt of this compensation, such that they were not required to include it in their gross income. For the reasons that follow, we disagree.

11

1.

It is a well-settled principle of tax law that compensation is included in the taxable income of the person who earned it, notwithstanding any assignment or transfer of that compensation to a third party. See *Lucas v. Earl*, 281 U.S. 111, 114–15 (1930). Thus, the mere fact that petitioners purported to return their vested shares back to UMLIC S-Corp. has no effect on their individual tax liability. Likely aware of this fundamental rule, petitioners advance a slightly different argument premised on the tax rescission doctrine.[3] Specifically, they maintain that the Surrender Transactions effectuated a complete rescission of their contractual agreements with UMLIC S-Corp., and because that rescission occurred in the same year as petitioners' receipt of compensation income under those agreements, that income should be disregarded for federal income tax purposes.

We do not see it. The Surrender Transactions did not restore petitioners "to the relative positions that they would have occupied had no contract been made," which is a fundamental requirement for application of the rescission doctrine. Rev. Rul. 80-58, 1980-1 C.B. 181, 181; *Hutcheson v. Comm'r*, 71 T.C.M. (CCH) 2425, at *4 (1996) ("For the rescission to be effective, both buyer and seller must be put back in their original positions."); see also *Reeves v. United States*, 173 F. Supp. 779, 781 (M.D. Ala. 1959). Put simply, if you can't restore, you can't rescind. The contracts at issue here were for personal services, namely the five years of services performed by petitioners on behalf of UMLIC

---

[3] The parties dispute whether petitioners have waived any argument based on the rescission doctrine. We need not resolve this question because, as discussed below, we find that petitioners' rescission arguments are unavailing even if properly presented.

S-Corp. When a personal services contract has actually been performed, it is essentially impossible for the individual who rendered the services to be "returned" to his position ex ante. See Jasper L. Cummings, *Circular Cash Flows and the Federal Income Tax*, 64 Tax Law. 535, 602 (2011) (noting that "compensation arrangements are not well suited" to analysis under the tax rescission doctrine "because the employee cannot usually give back his or her performance"). What is more, as part of the underlying contracts, petitioners transferred the entirety of their interests in the UMLIC entities to UMLIC S-Corp., but they did not receive those assets back in the Surrender Transactions. See J.A. 1109–11. As such, the Surrender Transactions are completely unlike the prototypical instance of rescission, in which all property that changes hands is returned to its original owner. See Rev. Rul. 80-58, 1980-1 C.B. 181.

In attempting to fit the square peg of the Surrender Transactions into the round hole of the rescission doctrine, petitioners point to a line of authorities suggesting that compensation is not taxable to an employee if returned to his employer in the year it was received. See, e.g., *Russel v. Comm'r*, 35 B.T.A. 602 (1937). But those precedents are inapposite here. As the Tax Court has clarified, they stand only for the limited proposition that returned compensation may not be taxable income where "the original salary agreements . . . [were] subject to modification by the taxpayers and their employers and not absolute." *Jones v. Comm'r*, 82 T.C. 586, 591 (1984). There is no indication that petitioners' compensation agreements with UMLIC S-Corp. were open-ended in the sense contemplated by those cases, and petitioners' belated attempt to modify those agreements via the Surrender Transactions could not affect their tax liability. See *Leicht v. Comm'r*,

13

137 F.2d 433, 435 (8th Cir. 1943) ("[I]t is not given to a taxpayer to lift the federal tax-hand from income, which he has once received in absolute right, by an attempt thereafter to alter its legal status through modification of the agreement out of which it arose.").

2.

In any event, even if the Surrender Transactions could somehow be seen as rescinding petitioners' employment and compensation agreements with UMLIC S-Corp., we agree with the Tax Court's conclusion that those transactions were totally devoid of economic substance and must be disregarded for federal income tax purposes.

The economic substance doctrine effectuates the Supreme Court's command that the tax effect of a transaction should be based on "the objective economic realities of [the] transaction rather than . . . the particular form the parties employed." *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978). The doctrine permits the IRS to "ignore for tax purposes any sham transaction, *i.e.*, a transaction designed to create tax benefits rather than to serve a legitimate business purpose." *Hines v. United States*, 912 F.2d 736, 739 (4th Cir. 1990). We employ a two-prong test to determine if a given transaction should be disregarded pursuant to the doctrine. "To treat a transaction as a sham, the court must find [1] that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and [2] that the transaction has no economic substance because no reasonable possibility of profit exists." *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91 (4th Cir. 1985). The first prong of the test is subjective, and the second is objective; nevertheless, while we "examine both the subjective motivations of the taxpayer and the objective reasonableness of the investment, in both instances our inquiry is directed

14

to the same question: whether the transaction contained economic substance aside from the tax consequences." *Black & Decker Corp. v. United States*, 436 F.3d 431, 441 (4th Cir. 2006) (internal quotation marks omitted). Whether a particular transaction was a sham is a question of fact that we review only for clear error. *Rice's Toyota World, Inc.*, 752 F.2d at 92.

Application of the foregoing principles to the instant case reveals that the Surrender Transactions were indeed nothing more than a sham to avoid tax liability and were rightly disregarded by the Tax Court.

Petitioners' own admissions satisfy the first prong of the economic substance test. At trial, petitioners proffered only one business purpose for the Surrender Transactions— relieving UMLIC S-Corp. from the burden of withholding and paying payroll and employment taxes attributable to the $92 million of compensation income realized by petitioners when their restricted stock vested. See J.A. 1295–96. But as the Tax Court noted, "[t]hat is in itself a tax-avoidance purpose," and "by admitting that [they] sought to avoid payment of employment taxes, [petitioners] in effect admitted that they sought to avoid payment of income taxes, because the former would not be payable unless the latter were payable also." *Austin*, T.C. Memo. 2017-69, at *40–41.

Surprisingly, petitioners double down on their position in this appeal. They candidly acknowledge that the only reason they executed the Surrender Transactions was to enable UMLIC S-Corp. to avoid withholding and remitting approximately $33 million in state and federal payroll and income taxes. Petitioners maintain that this course of action was necessary to ensure UMLIC S-Corp.'s continued viability as a going concern. This is

15

because, according to petitioners, UMLIC S-Corp. did not have enough cash on hand to cover its tax withholding obligations, an assertion that the Tax Court found to be unsupported by the evidence at trial. See *Austin*, T.C. Memo. 2017-69, at *40 n.13. But even if that were true, it does nothing to change the fact that the sole purpose for the Surrender Transactions was the avoidance of tax obligations, both those of UMLIC S-Corp. and, by extension, those of petitioners. Under our case law, that is enough to satisfy the first prong of the economic substance test. See *Friedman v. Comm'r*, 869 F.2d 785, 792 (4th Cir. 1989) (noting that the first prong "requires a showing that the only purpose for entering into the transaction was the tax consequences").

The second prong of the economic substance test is likewise met here. As the Tax Court found, it is inconceivable that either petitioner "could envision a reasonable possibility of profit by surrendering, for no consideration, stock worth $45.8 million." *Austin*, T.C. Memo. 2017-69, at *41. The fact that petitioners each gave UMLIC S-Corp. a $41.5 million promissory note as part of the Surrender Transactions only bolsters this conclusion, as "no rational person would incur indebtedness of $41.5 million to acquire stock that he already owned free and clear." *Ibid.* On the record before us, we cannot say that these findings were anything but sound.

Petitioners' final argument regarding economic substance is based on the promissory notes that they conveyed in exchange for the newly issued UMLIC S-Corp. stock. On petitioners' telling, because those notes constituted recourse debt, they had independent economic substance such that their value should have been added to petitioners' basis in their UMLIC S-Corp. shares. This basis increase would have caused

16

them to realize only $4.2 million in taxable income when those shares vested, rather than the $45.7 million found by the Tax Court.

Again, we must disagree. For starters, we concur with the Tax Court's finding that that the notes lacked economic substance and should be disregarded for tax purposes because they were issued by petitioners to a company owned and controlled by petitioners. In other words, petitioners effectively issued the notes to themselves. See *Austin*, T.C. Memo. 2017-69, at *41. But there is an additional problem with their argument. As petitioners themselves point out, the notes were "used to *purchase* stock in UMLIC." Petitioners' Reply Br. 11 (emphasis added). Thus, even if the notes had economic substance, their value would be included in petitioners' basis for the *new* UMLIC stock that they purchased in March 2004, not the *original* UMLIC stock that they acquired in 1998. See 26 U.S.C. § 1012(a) (defining "basis of property" as "the cost of such property"). Thus, the notes could not possibly offset any of the taxable income petitioners realized when the original shares vested in January 2004.

B.

Petitioners also take issue with the Tax Court's decision affirming the Commissioner's imposition of accuracy-related penalties.

I.R.C. § 6662 provides for the imposition of a 20% penalty on "any portion of an underpayment of tax" that is attributable to, *inter alia*, "[n]egligence or disregard of rules or regulations" or "[a]ny substantial understatement of income tax." 26 U.S.C. § 6662(a), (b)(1), (b)(2). But "[n]o penalty shall be imposed under section 6662 . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such

portion and that the taxpayer acted in good faith with respect to such portion." 26 U.S.C. § 6664(c)(1). In determining whether a taxpayer acted with reasonable cause and good faith, we consider "all the pertinent facts and circumstances," but "[g]enerally the most important factor is the extent of the taxpayer's effort to assess [his] proper tax liability." Treas. Reg. § 1.6664-4(b)(1). Whether a taxpayer acted with reasonable cause and in good faith is a question of fact, thus we review the Tax Court's findings on this score only for clear error. *Baxter*, 910 F.3d at 165 (citing *Antonides v. Comm'r*, 893 F.2d 656, 659 (4th Cir. 1990)).

The Tax Court held that each petitioner's failure to report $41.2 million of income on his UMLIC S-Corp. stock was attributable to negligence and amounted to a substantial understatement of tax. *Austin*, T.C. Memo. 2017-69, at \*45. Petitioners do not contest this conclusion. Rather, they maintain that they should not have been subject to accuracy-related penalties because they had reasonable cause for the tax position they took with respect to the Surrender Transactions, they acted in good faith, and the issues presented in this case are novel.

We disagree. For starters, as the Tax Court pointed out, petitioners have presented neither evidence nor legal authority to suggest that they made any effort to accurately assess their 2004 tax liability. See *Austin*, T.C. Memo. 2017-69, at \*46–47. They did not obtain or rely on the opinion of a tax professional in adopting their position regarding the tax effect of the Surrender Transactions. Moreover, petitioners structured the Transactions with the specific purpose of evading tax liability on the compensation income that even petitioners admit they realized at the moment their shares substantially vested. And they

18

can point to no legal authority suggesting that the Surrender Transactions were anything other than a sham designed to avoid taxes that should be disregarded. In sum, we agree with the Tax Court's finding that "[p]etitioners' overall conduct shows that they were fully aware of the tax consequences of their stock's becoming substantially vested," and their efforts to escape that liability did not rest on an "honest misunderstanding of fact or law that was reasonable under all the circumstances." *Austin*, T.C. Memo. 2017-69, at *47 (internal quotation marks omitted). As such, petitioners have failed to establish a defense of reasonable cause and good faith.

Petitioners' argument that the tax law issues in this case are novel does nothing to change our conclusion. For one thing, we have never recognized novelty as a stand-alone defense to the imposition of accuracy-related penalties. See *Baxter*, 910 F.3d at 168. More importantly, there is nothing novel about the legal issues presented by or doctrines applied in this case. That the law prohibits a taxpayer from avoiding tax liability by means of a sham transaction is a rule almost as old as the federal income tax system. See, e.g., *Gregory v. Helvering*, 293 U.S. 465, 468–70 (1935); see also *Baxter*, 910 F.3d at 168 (rejecting a similar novelty argument on the grounds that "it [is] well-established that transactions lacking economic substance must be disregarded for tax purposes"). There is no reason that petitioners, sophisticated businessmen who were clearly cognizant of the tax consequences of their actions, could have reasonably expected that the Surrender Transactions would be exempted from this longstanding rule. See Treas. Reg. § 1.6664-4(b)(1) (noting that "the experience, knowledge, and education of the taxpayer" is relevant in assessing accuracy-related penalty defenses).

III.

Petitioners further maintain that the Tax Court erred in refusing to consider their NOL carryback claim during post-trial computation proceedings conducted pursuant to Tax Court Rule 155. In short, petitioners assert that the Tax Court was affirmatively required to take account of their NOL claims during this computational phase because, if those claims were valid, they could have affected petitioners' tax liability for the taxable year at issue in this case. That argument is contrary to both the rules and well-settled precedent of the Tax Court, and we reject it.

Rule 155 authorizes the Tax Court to conduct further proceedings after it "has filed or stated its opinion or issued a dispositive order determining the issues in a case," for the limited purpose of calculating a party's precise tax liability. T.C. Rule 155(a). In the course of these proceedings, parties are specifically prohibited from raising "new issues" that go beyond "computation of the amount to be included in the decision resulting from the findings and conclusions made by the Court." *Id.* 155(c); *Vessio v. Comm'r*, 60 T.C.M. (CCH) 1150, 1150 (1990) ("The exclusive purpose of proceedings under Rule 155 . . . is the computation of the deficiency, liability, or overpayment resulting from the findings and conclusions made by the Court."); see also *Vento v. Comm'r*, 152 T.C. 1, 9 (2019) (noting that the bar on new issues is "rigorously enforce[d]" by the Tax Court). For purposes of Rule 155, a new issue is one that "was neither placed in issue by the pleadings, addressed as an issue at trial, nor discussed by [the Tax] Court in its prior opinion," or one that "would necessitate retrial or reconsideration." *Vento*, 152 T.C. at 8 (internal quotation marks omitted). We review the Tax Court's refusal to consider a new issue in Rule 155

20

proceedings for abuse of discretion. See *Powell v. Comm'r*, 581 F.3d 1267, 1269–70 (10th Cir. 2009).

Petitioners' NOL claim was clearly a "new issue" within the meaning of Rule 155. Quite simply, petitioners' entitlement to NOL carrybacks from 2008 was not meaningfully addressed in the Tax Court proceedings on the merits. On the contrary, petitioners did not include any NOL carryback claims in their original or amended petitions and failed to raise them in their final pre-trial memorandum and post-trial briefing. The merits of the issue were not litigated at trial. Consequently, the question of petitioners' entitlement to NOL carrybacks formed no part of the "decision resulting from the findings and conclusions made by the [Tax] Court," and consideration of that issue would have required the court to reopen the record. T.C. Rule 155(c); see also *Vento*, 152 T.C. at 8 (noting that the Tax Court has found a taxpayer's "entitlement to a net operating loss carryback" to be a new issue for the purposes of Rule 155 (citing *Vest v. Comm'r*, 69 T.C.M. (CCH) 2491, 2493 (1995))). As such, it was no abuse of discretion for the Tax Court to reject petitioners' attempt to raise this new issue during Rule 155 proceedings.

In an effort to evade the effect of Rule 155, petitioners assert that a provision of the I.R.C., namely Section 6214(b), required the Tax Court to consider their NOL claim. In pertinent part, Section 6214(b) provides that "in redetermining a deficiency of income tax for any taxable year," the Tax Court "shall consider such facts with relation to the taxes for other years or calendar quarters as may be necessary correctly to redetermine the amount of such deficiency." 26 U.S.C. § 6214(b). On petitioners' reading, this section "specifically *requires* the Tax Court to consider such facts with relation to the taxes for

21

other years as may be necessary to correctly redetermine the amount of any tax deficiency." Petitioners' Reply Br. 18. And because, according to petitioners, application of their 2008 NOLs to taxable year 2004 could have reduced their tax liability for that year, the Tax Court had no discretion to exclude them from its Rule 155 computations.

We cannot accept petitioners' expansive understanding of Section 6214(b). For starters, petitioners' argument proves too much. If adopted, it would effectively vitiate Rule 155, as the Tax Court would be required to consider every new issue raised during the computation phase that could conceivably affect the taxpayer's ultimate liability. Petitioners have failed to identify any authority supporting such a broad interpretation, and we have found none. But that is hardly surprising, as petitioners completely misread Section 6214(b). Rather than an affirmative mandate to the Tax Court, Section 6214(b) is simply a jurisdictional provision authorizing that court to consider facts from taxable years not at issue when calculating liability for those years that are at issue. See *Estate of Branson v. Comm'r*, 264 F.3d 904, 912–13 (9th Cir. 2001) (characterizing Section 6214(b) as jurisdictional). It does not limit the Tax Court's ability to regulate its own proceedings or insist on the timely presentation of substantive claims prior to the Rule 155 computational phase.

IV.

In conclusion, we affirm the decision of the Tax Court on all issues.

*AFFIRMED*